

FILED

Apr 14 2020, 8:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John Kindley
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Myriam Serrano
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Presley Jermaine Brown,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

April 14, 2020

Court of Appeals Case No.
19A-CR-2125

Appeal from the St. Joseph
Superior Court

The Honorable Jane Woodward
Miller, Judge

Trial Court Cause No.
71D01-1712-MR-15

**Crone, Judge.**

# Case Summary

[1] Presley Jermaine Brown appeals his convictions for murder, a felony, and level 3 felony attempted armed robbery. He contends that the trial court erred by admitting documents purportedly handwritten by Brown without authenticating the handwriting as Brown's. Finding no error in the admission of the documents, we affirm.

# Facts and Procedural History

[2] On October 5, 2016, Brown asked Caleb Smith to set up a robbery to obtain drugs or money. Tr. Vol. 2 at 75. Smith's girlfriend Miranda Gayheart identified Miguel Dominguez-Campos as a potential individual to rob, and she contacted Dominguez via Facebook messenger to purchase marijuana. *Id.* at 57, 81; Tr. Vol. 1 at 215. In the early morning hours of October 6, 2016, Smith drove Brown and Brown's friend Sir Lloyd to Dominguez' house on Meadow Lane. Tr. Vol. 2 at 95. Smith parked across the street from the house, and Brown and Lloyd got out of the vehicle. About the same time, Smith saw a car pull into the house's driveway. *Id.* at 96. Tyler Hurtle, who lived with Dominguez, was driving that car, and Hurtle's girlfriend Shaelynn Martin was a passenger. Tr. Vol. 1 at 193, 194-95. After Hurtle parked the car, he and Martin walked to the front door. As Hurtle was unlocking the door, two armed African-American men appeared and hit Hurtle on the head. *Id.* at 198. Hurtle fell into the bushes. Martin heard gunshots and ran back toward the driveway. *Id.*

[3] Smith, who was still in the car, heard gunshots and got out of the car. He saw Brown running through the yard to the car. Tr. Vol. 2 at 97. Brown had a mask on and was carrying a gun, and he told Smith that his gun had jammed. *Id.* at 98. Smith also saw Lloyd running around the side of the house and shooting at Martin. *Id.* at 97. Lloyd, Brown, and Smith got into the car, and Smith drove them away.

[4] Dominguez heard gunshots and came out of the house. Tr. Vol. 1 at 218. Dominguez saw Smith, whom he knew, standing by the car across the street and two men running toward it. All three men got in the car, and the car sped away. Martin told Dominquez-Campos that Hurtle had been shot. They pulled Hurtle, who was unresponsive and had a small amount of blood on his head, out of the bushes and called the police. *Id.* at 222.

[5] Police and medics arrived at the crime scene. Hurtle was taken by ambulance to the hospital and died of multiple gunshot wounds. An autopsy revealed that a bullet had entered Hurtle's left forehead and exited next to his right eye. Another bullet had entered the left side of Hurtle's chest wall, traveled through his lung, diaphragm, and intestines, and remained lodged in the soft tissue of Hurtle's hip. The bullet was recovered and came from a 9-millimeter handgun. Tr. Vol. 2 at 160; State's Ex. 253.

[6] From the crime scene, police recovered four shell casings from a 9-millimeter handgun and seven shell casings from a .45 caliber gun. Tr. Vol. 2 at 52. A firearm expert determined that the .45 caliber shell casings had been fired from

a .45 caliber gun that Lloyd had dropped when police were pursuing him for an unrelated crime. *Id*. at 209-10, 250. The shell casings that came from a 9-millimeter handgun and the bullet recovered from Hurtle's body were determined to have been shot from a gun that had been in Brown's possession. The police also obtained Brown's cellular phone record, which showed that he was in the vicinity of Meadow Lane at the time of the shooting. *Id*. at 232.

[7] In December 2017, the State charged Brown with Count 1, murder, a felony; Count 2, murder while committing or attempting to commit armed robbery, a felony; and Count 3, level 3 felony attempted armed robbery. The State also filed a firearm sentencing enhancement.

[8] While Brown was incarcerated in the St. Joseph County Jail, he relayed details of his crime to several fellow inmates. Brown told Byron Murray that he and Lloyd shot someone and that Brown was worried that Smith was going to tell the police because Smith had stayed in the car. *Id*. at 171-73. Brown also told Murray that he gave the gun that he used to shoot the victim to an individual called "BK." *Id*. at 173. Brown told Javon Crockett-Berry that he went to a house on Meadow Lane to rob someone of marijuana, and while at the house, a white man walked up and both Brown and Lloyd shot the man. *Id*. at 185. Brown also told Crockett-Berry that he was going to give Lloyd or Lloyd's attorney a statement that he wrote blaming Smith for the murder. *Id.* at 188. Brown told Cedric Washington, Andre Pittman, Denzel Bridges, and Demetrius Thomas that he went to a house on Meadow Lane to rob someone of marijuana and ended up shooting a white man. Tr. Vol. 3 at 16, 29, 47, 58-

59. Brown also told Thomas that he wrote a letter to Lloyd's attorney blaming Smith for the murder. *Id*. at 60.

[9] A jury trial was held. During the State's case in chief, the prosecutor offered as State's Exhibit 401 a copy of a letter purportedly handwritten by Brown and sent by him to Lloyd's attorney Jeffrey Kimmel. *Id*. at 37; Ex. Vol. 2 at 92-95. To provide a foundation for the letter's admission, Kimmel testified that shortly before Lloyd's case went to trial, Kimmel received a handwritten letter that purported to be from Brown in an envelope mailed from the St. Joseph County Jail.[1] Tr. Vol. 3 at 35-36, 39. Kimmel stated that he made a photocopy of the letter and turned it over to the prosecutor's office. *Id*. at 36. Kimmel testified that Exhibit 401 looked like a photocopy of the letter that he received. *Id*. at 37.

[10] Brown's attorney objected to the admission of Exhibit 401 on the basis that Kimmel had never seen Brown's handwriting and could not authenticate the letter. *Id*. at 39. The prosecutor then asked the trial court to take judicial notice of State's Exhibits 402 and 403 to provide the jury with a sample of Brown's writing, so that the jury could determine whether Exhibit 401 had been written by Brown. *Id*. at 39. Exhibit 402 was a letter written by Brown to the St. Joseph County clerk of the court and the envelope in which it arrived. Ex. Vol. 2 at 97-98. In the letter, Brown asked the clerk to send Brown a certified chronological case summary ("CCS") of this cause. *Id*. at 98. The envelope

---

[1] Exhibit 401 did not include the envelope that the letter was sent in.

contained Brown's return address, and it was stamped with "Mailed From St. Joseph County Jail[.]" *Id.* at 97. The letter and envelope were both file-stamped by the St. Joseph County clerk on March 19, 2019, and the filing of the correspondence was recorded in the CCS. Appellant's App. Vol. 2 at 10.

[11] Exhibit 403 was a letter written by Brown to the trial court and the envelope in which it arrived. Ex. Vol. 2 at 99-101. In this letter, Brown stated that his court-appointed attorney Sean Hilgendorf had failed to respond to repeated requests for communication, and Brown did not want Hilgendorf to represent him any longer. *Id.* at 100-01. The envelope contained Brown's return address, and it was stamped with "Mailed From St. Joseph County Jail[.]" *Id.* at 99. The letter and envelope were both file-stamped by the St. Joseph County Clerk on February 13, 2018, and the filing of the correspondence was recorded in the CCS. Appellant's App. Vol. 2 at 5.

[12] Brown's attorney objected to Exhibits 402 and 403 on grounds that there was no proof that Brown wrote the letters. Tr. Vol. 3 at 39, 41. The prosecutor stated that a hearing had been held before trial to address the contents of Exhibit 403. *Id.* at 39. After reviewing the case file, the trial court told the parties that the CCS showed that Exhibit 403 was filed on February 13, 2018, and contained an entry reflecting that on February 20, the court had issued an order setting a hearing on Brown's "letter of complaint regarding attorney" for February 27. *Id.* at 69. The court stated that a hearing was held on that date and the issue was resolved, that Brown appeared at the hearing, and that there was nothing in the entry of February 27 to suggest that Brown "came in and

declared that he had not written that document[.]" *Id*. at 69, 70. The court concluded that it had "acted upon [the letter] with [Brown] present. So, it seem[ed] unlikely that someone other than [Brown] wrote it." *Id*. at 72. The court explained that the jury could do a handwriting comparison and that the court was "confident under these circumstances that there is sufficient foundation when [the court] take[s] judicial notice of the record in this case to warrant [it] permitting the introduction of [Exhibit] 403 as what is in essence an exemplar and that sufficient foundation was raised to admit [Exhibit] 401[.]" *Id*. at 74.

[13] Prior to the admission of these exhibits, the State also introduced the testimony of Crockett-Berry and Thomas, who stated that Brown had told them that he had written a letter to Lloyd's attorney blaming Smith for the murder. Tr. Vol. 2 at 188; Tr. Vol. 3 at 60.

[14] In response to Exhibit 401, Brown's attorney moved to admit Defense's Exhibit B, Brown's affidavit to deny allegation, as a handwriting sample for the jury to use as a comparator. *Id*. at 76-77; Ex. Vol. 2 at 92-96. The Court took judicial notice of Exhibits 402 and 403 and admitted Exhibit 401 and Defense's Exhibit B. Tr. Vol. 3 at 118, 120. All the exhibits were published.

[15] The jury found Brown guilty as charged. The trial court entered judgment of conviction for Counts 1 and 3 and sentenced Brown to an executed term of sixty years for Count 1, enhanced by twenty years for the firearm enhancement,

and a consecutive executed term of twelve years for Count 3, for an aggregate term of ninety-two years. This appeal ensued.

## Discussion and Decision

[16] Brown challenges the admission of Exhibits 401, 402, and 403, arguing that there was insufficient evidence of authentication. Our standard of review for the admissibility of evidence is well established:

> The admission or exclusion of evidence lies within the sound discretion of the trial court and is afforded great deference on appeal. We will reverse the trial court's ruling on the admissibility of evidence only for an abuse of discretion. An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. In reviewing the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the defendant's favor. Errors in the admission or exclusion of evidence are considered harmless unless they affect the substantial rights of a party. To determine whether an error in the admission of evidence affected a party's substantial rights, we assess the probable impact of the evidence on the jury.

*Whiteside v. State*, 853 N.E.2d 1021, 1025 (Ind. Ct. App. 2006) (citations omitted); *see also Thomas v. State*, 734 N.E.2d 572, 573 (Ind. 2000) (stating that trial court's ruling on sufficiency of foundation laid for admission of evidence is reviewed for abuse of discretion).

[17] Evidence Rule 901(a) provides, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence

sufficient to support a finding that the matter in question is what its proponent claims." Evidence Rule 901(b) includes a nonexhaustive list of examples of satisfactory evidence of authentication, including the following: "[a] comparison with an authenticated specimen by an expert witness or the trier of fact" and "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Ind. Evid. Rule 901(b)(-3), (-4). "Absolute proof of authenticity is not required." *Wilson v. State*, 30 N.E.3d 1264, 1268 (Ind. Ct. App. 2015) (quoting *Fry v. State*, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), *trans. denied*), *trans. denied*. "Rather, the proponent of the evidence must establish only a reasonable probability that the evidence is what it is claimed to be, and may use direct or circumstantial evidence to do so." *Richardson v. State*, 79 N.E.3d 958, 962 (Ind. Ct. App. 2017), *trans. denied*. "Once this reasonable probability is shown, any inconclusiveness regarding the exhibit's connection with the events at issue goes to the exhibit's weight, not its admissibility." *Harrison v. State*, 32 N.E.3d 240, 255 (Ind. Ct. App. 2015), *trans. denied*.

[18] Here, Brown objected to the admissibility of Exhibit 401 because there was insufficient evidence that he had written the letter. The trial court took judicial notice that Exhibits 402 and 403 had been written by Brown and admitted them as examples for the jury to determine whether Exhibit 401 had been written by

Brown.[2] Brown contends that the trial court erred in allowing the jury to determine whether he wrote Exhibit 401 by comparing the handwriting in Exhibit 401 with that in Exhibits 402 and 403 because they had not been properly authenticated.

[19] In support of his position, Brown relies on *Payne v. State*, 96 N.E.3d 606 (Ind. Ct. App. 2018), *trans. denied*. In that case, Payne was convicted of level 4 felony unlawful possession of a firearm by a serious violent felon, and on appeal he argued that there was insufficient evidence that he had been previously convicted of a qualifying felony, specifically robbery. To prove that Payne had been previously convicted of robbery,

> the State offered certified records from a 2010 robbery conviction and claimed that the records proved that Payne was the defendant in that cause who had previously been convicted of robbery. The records included the charging information, probable cause affidavit, supplemental probable cause affidavit, plea agreement, the trial court's order on plea hearing, and the trial court's sentencing order, which were all labeled with the same

---

[2] Indiana Evidence Rule 201 authorizes a court to take judicial notice of

   (1) a fact that:

   (A) is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction, or

   (B) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

   (2) the existence of:

   (A) published regulations of governmental agencies;

   (B) ordinances of municipalities; or

   (C) records of a court of this state.

cause number. The charging information included the robbery defendant's name and birth date, which matched Payne's name and birth date as listed in the instant cause, as well as the robbery defendant's driver's license number, which did not match the information in the instant cause. *The plea agreement included the robbery defendant's name, birth date, and signature.* The trial court's order on plea agreement and sentencing order contained only the robbery defendant's name. The State rested its case without further testimony.

*Id*. at 609 (emphasis added).

[20] Payne argued that this certified record was insufficient to prove that he was the same person who had committed the robbery because the matching name and birth date were not sufficient to prove his identity. The majority of the *Payne* court agreed that "a matching name and birth date, absent other identifying evidence, are not sufficient to prove identity." *Id*. at 612 (citing *Livingston v. State*, 537 N.E.2d 75, 78 (Ind. Ct. App. 1989)). The State contended that it produced additional evidence of Payne's identity because the plea agreement in the robbery cause and the signed advisement of rights form in the unlawful firearm possession case both contained Payne's signature. The majority rejected this argument because "the signature within the plea agreement had not been authenticated as belonging to Payne." *Id*. The majority reasoned,

> [T]he State did not introduce expert or non-expert testimony to authenticate the signature [in the plea agreement]; nor did Payne admit that the signature was his. Accordingly, the signature was never authenticated, and the only evidence the State introduced to prove Payne's identity as the defendant in the robbery cause was the evidence of the robbery defendant's name and birth date.

*Id*. at 613.

[21] Brown focuses on the fact that the *Payne* court did not rely on the signed advisement of rights in that cause as a means to authenticate the signature on the plea agreement in the robbery cause. However, the *Payne* court did not address whether the signature on the advisement of rights in that cause could have been used by the trier of fact to authenticate the signature on the plea agreement in the robbery cause because the prosecutor had not raised that possibility to the trial court or asked the trial court to take judicial notice that the signature on the advisement of rights was Payne's. Therefore, *Payne* is inapposite to the question presented here.

[22] Instead, we find *Owen v. State*, 272 Ind. 122, 396 N.E.2d 376 (1979), more helpful. There, Owen was charged with robbery and represented himself pro se. The prosecutor asked the trial court to take judicial notice of Owen's pleadings and filings in the cause and allow the jury to compare them to a handwritten note left by the robber at the scene of the robbery. Our supreme court concluded that it was reasonable "under the circumstances of this case, for the court to take judicial notice of the fact that the defendant is the one who did, in fact, sign these pleadings." *Id*. at 129, 396 N.E.2d at 381. The *Owen* court reasoned that it was reasonable based on the following circumstances:

> [Owen] acted as his own attorney in this cause throughout the
> pleading stage, tried the case before the jury, argued these matters
> and spoke of them before the jury during the trial and in final
> argument. He testified as a witness in his own behalf and never

> denied that he was the one who actually wrote all of the pleadings and signed his name thereto.

*Id*., 396 N.E.2d at 381. The *Owen* court continued, "The trial judge may take judicial notice [that the defendant signed the pleadings], and a rebuttable presumption arises which requires the defendant to come forward with any evidence to dispute the presumption." *Id*., 396 N.E.2d at 381 The court noted that *Owen* did not attempt to demonstrate that the documents judicially noticed were not written by him, but only objected to notice being taken of them because the trial judge did not personally see him sign them. *Id*., 396 N.E.2d at 382. Accordingly, the *Owen* court concluded that the "trial court could have taken judicial notice that the documents were in the record filed on behalf of the defendant and have permitted the jury to infer that they were, in fact, signed by the defendant." *Id*. at 130, 396 N.E.2d at 382.

[23] Although Brown did not proceed pro se as Owen did, we have no difficulty concluding that under the circumstances it was reasonable for the trial court to take judicial notice that the handwriting and signatures in Exhibits 402 and 403 were Brown's. We first examine Exhibit 403, the 2018 letter to the trial court complaining about the lack of communication from Brown's court-appointed attorney. The contents of the letter, that it was mailed from the jail where Brown was incarcerated, that a hearing was held to address the letter's concerns, that Brown appeared at the hearing, and that the concerns expressed in the letter were resolved and a pretrial hearing was set all support the trial court's decision to take judicial notice that the handwriting and signature in

Exhibit 403 were Brown's. Exhibit 402, the 2019 letter from Brown, was mailed from the jail where Brown was incarcerated and asked the clerk to send Brown the CCS, and the handwriting looks like the handwriting in the 2018 letter. Under the circumstances, it was reasonable for the trial court to take judicial notice that the documents filed with the court had been written by Brown.[3] Therefore, the trial court did not abuse its discretion in admitting the State's exhibits, and we affirm Brown's convictions.

Affirmed.

Bailey, J., and Altice, J., concur.

---

[3] A rebuttable presumption then arose that the documents had been written by Brown requiring Brown to come forward with evidence to dispute the presumption. Brown moved to admit Defendant's Exhibit B, a separate writing sample of Brown's, which the trial court granted. Thus, the jury was able to compare the handwriting in the court-filed documents and the writing sample that Brown provided to the letter Kimmel received to determine whether Brown wrote it.